492 A.2d 618

**Robert E. FLAHERTY et ux.**

v.

**Manuel WEINBERG et al.**

**No. 118, Sept. Term, 1983.**

Court of Appeals of Maryland.

May 28, 1985.

120

Brian J. Nash, Silver Spring (Hugh E. Donovan and Donovan & Nash, Silver Spring, on brief), for appellants.

Ronald W. Fuchs, Baltimore (Edward J. Hutchins, Jr., and Eccleston & Seidler, Baltimore, on brief), for appellees.

Argued before MURPHY, C.J., ELDRIDGE, COLE, DAVIDSON *, RODOWSKY and COUCH, JJ., and W. AL-

---

* Davidson, J., participated in the hearing and in the conference of the case in regard to its decision, but died prior to the adoption of the opinion by the Court.

BERT MENCHINE, Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

COLE, Judge.

The question presented in this case is whether an attorney is liable to a nonclient for professional malpractice. Because we recognize that liability may attach in certain limited circumstances and because we last examined this issue over a decade ago, *see Prescott v. Coppage*, 266 Md. 562, 296 A.2d 150 (1972), and because of the significant increase in case law and professional literature on attorney liability to third parties,[1] we find it useful to review the present state of the law on this subject before stating our answer.

## I

A majority of American courts evidently continue to adhere to the view expressed in a 105-year-old Supreme Court decision holding that absent fraud, collusion, or privity of contract, an attorney is not liable to a third party for professional malpractice.[2] *National Savings Bank v.*

---

**1.** Jurisdictions have addressed the issue of attorney liability to third parties with increasing frequency. *See, e.g., Pelham v. Griesheimer,* 92 Ill.2d 13, 64 Ill.Dec. 544, 440 N.E.2d 96 (1982); *Guy v. Liederbach,* 501 Pa. 47, 459 A.2d 744 (1983). This increase has been reflected in the legal journals, with at least 12 articles devoted to this issue in the last five years alone. *See, e.g.,* Probert & Hendricks, *Lawyer Malpractice: Duty Relationships Beyond Contract,* 55 Notre Dame Law. 708 (1980); Note, *Attorneys' Negligence and Third Parties,* 57 N.Y.U.L.Rev. 126 (1982) [hereinafter cited as Note, *Attorneys' Negligence* ].

**2.** *See, e.g., Lilyhorn v. Dier,* 214 Neb. 728, 335 N.W.2d 554 (1983); *St. Mary's Church v. Tomek,* 212 Neb. 728, 325 N.W.2d 164 (1982); *Border City Sav. & Loan Ass'n v. Moan,* 15 Ohio St.3d 65, 472 N.E.2d 350 (1984) (per curiam) (attorney not liable to third party unless the latter is in privity with the *client* or the attorney acts maliciously); *Scholler v. Scholler,* 10 Ohio St.3d 98, 462 N.E.2d 158 (1984) (same); *First Mun. Leasing Corp. v. Blankenship, Potts, Aikman, Hagin & Stewart,* 648 S.W.2d 410 (Tex.Ct.App.1983). Some commentators have taken issue with this characterization, reasoning that no jurisdiction would permit a third party to bring a negligence suit against an attorney under

*Ward,* 100 U.S. 195, 25 L.Ed. 621 (1880) (6–3 decision). In that case, a negligence action was instituted against an attorney by a third party lender who had relied on the attorney's certification of title in making a loan secured by land purportedly owned by the prospective borrower. The attorney certified the client's title as good even though the client had previously sold the property. After this certification, the client obtained brokers to negotiate a $3,500 loan. The borrower signed a note payable to the brokers and designated the brokers as trustees in a trust deed. The brokers secured a loan from the lender and used the certificate of title and trust deed as collateral. When the borrower failed to pay the note at maturity, the lender discovered that the attorney, with whom it had no contract or communication, had negligently certified that his client had good record title. Referring to a line of English cases, *see, e.g., Winterbottom v. Wright,* 10 Messon & Welsby 109, 152 Eng.Rep. 402 (1842), the Supreme Court held that the attorney was not liable to the lender because of the absence of privity. Although the attorney should have discovered the sale through the exercise of reasonable care, the Court stated that a third party could recover against the attorney only in cases involving fraud or collusion.[3] *National Savings Bank v. Ward, supra,* 100 U.S. at 205–06, 25 L.Ed. at 625. *But see id.* at 207–08, 25 L.Ed. at 625–26 (Waite, C.J., dissenting) (attorneys' liability to third parties should be based on the foreseeability that a third party would rely on the attorneys' work).

---

those particular factual situations. R. Mallen & V. Levit, *Legal Malpractice* § 79, at 154 (2d ed. 1981).

**3.** This rule had its doctrinal origins in *Winterbottom v. Wright,* 10 Messon & Welsby 109, 153 Eng.Rep. 402 (1842), where Chief Baron Lord Abinger suggested in dicta that because only parties to a contract could sue on that contract, only those parties could also sue in tort. Some commentators have noted that American courts erroneously interpreted Lord Abinger's suggestion to mean that no action could exist in tort because of the absence of privity. *See Prosser and Keeton on the Law of Torts* § 93, at 668 (W. Keeton 5th ed. 1984).

Despite *National Savings Bank* and its progeny, the rule of strict contractual privity has been relaxed in modern jurisprudence. Beginning with an 1852 decision by the Court of Appeals of New York, American courts expressed a willingness to depart from the strict contractual privity rule. *See Thomas v. Winchester*, 6 N.Y. 397, 407–10 (1852) (ultimate consumer could sue manufacturer who negligently mislabeled a bottle of poison, although the consumer bought the bottle from a druggist). Subsequent decisions have confirmed that, in the words of Chief Judge (later Justice) Cardozo, "[t]he assault upon the citadel of privity is proceeding in these days apace." *Ultramares Corp. v. Touche, Niven & Co.*, 255 N.Y. 170, 180, 174 N.E. 441, 445 (1931); *see Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275 (1922) (Cardozo, J.) (privity of contract not required in cases involving economic loss caused by negligent services); *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916) (Cardozo, J.) (privity of contract not required in cases where the manufacturers' negligence caused physical injury to a third party).

Consistent with the erosion of the strict privity requirement in the above areas, a growing number of jurisdictions have made inroads into this requirement in attorney malpractice cases by employing one of two basic conceptual models: (1) the balancing of factors theory, or (2) the third party beneficiary theory.[4]

---

**4.** Other theories, less well accepted, include the assumption of duty theory and the fiduciary or agency theory. Note, *Attorneys' Negligence, supra*, 54 N.Y.U.L.Rev. at 138–45; *see* Note, *The* Pelham *Decision, Attorney Malpractice and Third-Party Nonclient Recovery: The Rise and Fall of Privity*, 3 N.Ill.U.L.Rev. 357 (1983). Under the assumption of duty theory, once an attorney gratuitously promises to act for the benefit of another and he actually undertakes to fulfill that promise, the attorney is held to a duty of care in fulfilling that promise. To establish a duty between the attorney and a third party, the third party plaintiff must show that an attorney undertook an action and that the third party's injuries were a foreseeable result of the negligent performance of that action. This theory, however, has evidently not been adopted by any jurisdiction in the context of

The Supreme Court of California was the first court to depart from the strict contractual privity rule of *National Savings Bank.* The California court formulated the balancing of factors theory in *Biakanja v. Irving,* 49 Cal.2d 647, 320 P.2d 16 (1958), refined it in the context of attorney malpractice in *Lucas v. Hamm,* 56 Cal.2d 583, 364 P.2d 685, 15 Cal.Rptr. 821 (1961), *cert. denied,* 368 U.S. 987, 82 S.Ct. 603, 7 L.Ed.2d 525 (1962), and applied it in *Heyer v. Flaig,* 70 Cal.2d 223, 449 P.2d 161, 74 Cal.Rptr. 225 (1969). *See also Bucquet v. Livingston,* 57 Cal.App.3d 914, 129 Cal. Rptr. 514 (1976) (applying factors); *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz,* 57 Cal.App.3d 104, 128 Cal.Rptr. 901 (1976) (same). Under this policy-based approach, the court balances the following factors in determining whether to impose a duty on attorneys not in privity with third parties: (1) the extent to which the transaction was intended to affect the plaintiff; (2) the foreseeability of harm to the plaintiff; (3) the degree of certainty that the plaintiff suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury; (5) the moral blame attached to the defendant's conduct; and (6) the policy of preventing future harm.[5] Although several jurisdictions have approved the *Lucas* balancing test to determine whether an attorney owes a duty to a third party, *see, e.g.,*

---

attorney malpractice. *See* Note, *Attorneys' Negligence, supra,* 57 N.Y. U.L.Rev. at 144–63 (urging adoption of assumption of duty theory).

The fiduciary or agency theory is also offered to support a finding that attorneys owe duties to third parties. This theory, similar to the assumption of duty theory, has gained little acceptance. *See Stewart v. Sbarro,* 142 N.J.Super. 581, 362 A.2d 581 (1976) (fiduciary theory offered as alternative theory); *McEvoy v. Helikson,* 277 Or. 781, 562 P.2d 540 (1977) (escrow agency theory offered as alternative theory). We express no opinion as to the validity of these theories in Maryland.

5. The *Lucas* court employed the Biakanja balancing test, but omitted without explanation the moral blame standard. In its place, the court inserted a standard relating to whether the recognition of liability to beneficiaries under a will would impose an undue burden on the legal profession. Subsequent decisions, however, have specified the moral blame standard. *See, e.g., Heyer v. Flaig,* 70 Cal.2d 223, 449 P.2d 161, 74 Cal.Rptr. 225 (1969).

*Bird v. Rothman,* 128 Ariz. 599, 627 P.2d 1097 (Ct.App. 1981); *Fickett v. Superior Court of Pima County,* 27 Ariz.App. 793, 558 P.2d 988 (1976); *Licata v. Spector,* 26 Conn.App. 378, 225 A.2d 28 (1966); *McAbee v. Edwards,* 340 So.2d 1167 (Fla.Dist.Ct.App.1976); *Jenkins v. Wheeler,* 69 N.C.App. 140, 316 S.E.2d 354 (quoting *United Leasing Corp. v. Miller,* 45 N.C.App. 404, 406–07, 263 S.E.2d 313, 318, *review denied,* 300 N.C. 374, 267 S.E.2d 685 (1980)), *review denied,* 311 N.C. 758, 321 S.E.2d 136 (1984); *Auric v. Continental Casualty Co.,* 111 Wis.2d 507, 331 N.W.2d 325 (1983), it has not met with universal acceptance. Some courts have eschewed that approach as too broad, *see Pelham v. Griesheimer,* 92 Ill.2d 13, 22, 64 Ill.Dec. 544, 548, 440 N.E.2d 96, 100 (1982), or so "unworkable" that it "has led to *ad hoc* determinations and inconsistent results[.]" *Guy v. Liederbach,* 501 Pa. 47, 57, 459 A.2d 744, 749 (1983).

■ The second conceptual model used in malpractice cases involving attorney liability to third parties is the third party beneficiary contract theory. In general terms, a third party beneficiary contract arises when two parties enter into an agreement with the intent to confer a direct benefit on a third party, allowing the third party to sue on the contract despite the lack of privity. Several jurisdictions, including Illinois and Pennsylvania, have adopted this particular approach. *See, e.g., Ogle v. Fuiten,* 102 Ill.2d 356, 80 Ill.Dec. 772, 466 N.E.2d 224 (1984); *York v. Stiefel,* 99 Ill.2d 312, 76 Ill.Dec. 88, 458 N.E.2d 488 (1984); *Pelham v. Griesheimer, supra; Guy v. Liederbach, supra.*

It is evident from the brief review above that the present state of the law governing attorney liability to nonclients is far from settled. Although some commentators suggest that the weight of authority supports the strict privity rule, most nonetheless agree that the trend is against this requirement. *See, e.g.,* D. Meiselman, *Attorney Malpractice: Law and Procedure* § 6:6, at 105 (1980); *Lawyers' Manual on Professional Conduct* (ABA/BNA) 71:1101 (1984); Annot., 45 A.L.R.3d 1181 (1972). According to a treatise in the area of attorney malpractice:

There is an abundance of authority for the proposition that only the client can sue the attorney for a negligent act or omission, and its corollary, that the attorney owes no duty to a person other than his client. Relying upon annotations and commentators, some courts have stated that a strict privity requirement is a majority rule. Such comments may reflect the holdings and dictum of the majority of the decisions under particular facts, but do not accurately characterize the state of the law in the United States.

The vast majority of such decisions concern factual situations where no jurisdiction would permit the plaintiff to bring a suit for negligence. Many reported decisions concern claims of opponents in litigation, yet no jurisdiction has found a duty by an attorney to an adverse party. Similar contentions by a client's divorced spouse or children have also been uniformly rejected.

Other limitations include the rejection of a duty to a buyer by a seller's attorney or to another attorney who referred the case.

One way to measure the strength of the privity rule is to examine those decisions concerning claims by a would-be beneficiary of a will. With the sole exception of New York, jurisdictions have permitted a cause of action. On the other hand, errors relating to certification of title to real property allegedly done for the benefit of the plaintiff have generally been rejected. Another indication of the strength of the privity rule is the trend of the more recent decisions. Suffice it to say that the vast majority of modern decisions favored expanding privity beyond the confines of the attorney-client relationship.

R. Mallen & V. Levit, *Legal Malpractice* § 79, at 152–54 (2d ed. 1981) (footnotes omitted).

## II

### A.

The evolution of the law in Maryland governing attorney liability to third parties has essentially paralleled the nation-

al development. For instance, in 1940 this Court adopted the traditional privity rule that an attorney owes a duty to his client or employer, and therefore only that client or employer can recover against him for that breach. *Wlodarek v. Thrift*, 178 Md. 453, 13 A.2d 774 (1940). In that case, an attorney (Thrift) was employed in 1925 by a contract purchaser to examine land titles. The attorney advised the purchaser that the title was good and merchantable. In reliance, the seller and purchaser concluded the settlement. The property later devolved to persons other than the attorney's client. When it was discovered that the attorney's opinion was incorrect and a title defect appeared, the question arose as to whether the successor in title could recover from the attorney. In answering this question in the negative, the *Wlodarek* Court held that the attorney's duty did not extend to the successors in title:

> It seems generally accepted that the liability of the defendants as attorneys to examine and pass upon a title to land is founded in contract and not in tort, and, therefore, does not, *as a general rule*, extend beyond the person by whom they were so employed. So, when the party with whom the contract is made is the purchaser, and he causes the title to the land, after paying the purchase money, to be conveyed by the vendor to his nominee, the subsequent loss and injury sustained by such nominee and his successors in the title, by reason of any defect in or absence of title, may not be recovered of the attorneys by such third parties as damages.

*Id.* at 468, 13 A.2d at 781 (emphasis supplied).

Shortly after the *Wlodarek* decision, this Court again determined that the strict privity requirement barred a cause of action by a nonclient against an attorney. *Kendall v. Rogers*, 181 Md. 606, 31 A.2d 312 (1943). Factually, a purchaser of a Kent County farm retained an attorney to correct a defect in title that predated the vendor's acquisition of the property. The attorney, however, erroneously informed the vendor that the covenant of special warranty in the deed obligated the vendor to correct the defect. The

vendor spent over $3,200 to cure the defective title. After the vendor learned that he was under no legal obligation to cure the title defect, he sued the purchaser's attorney. The trial court sustained the attorney's demurrer, and the plaintiffs appealed.

On appeal, the *Kendall* Court framed the issue as whether the attorney was employed to represent the plaintiffs as their attorney in the matter. *Id.* at 612, 31 A.2d at 315. In analyzing this issue, the Court adopted the tripartite test contained in *Maryland Casualty Co. v. Price*, 231 Fed. 397, 401 (4th Cir.1916). Under this test a plaintiff must prove the following elements to recover against an attorney in negligence: (1) the attorney's employment; (2) his neglect of a reasonable duty; and (3) loss to the client proximately caused by that neglect of duty. In a unanimous opinion, the *Kendall* Court found that the plaintiff did not state a cause of action because there was no attorney-client relationship between the parties:

> "The attorney is liable for his negligence in certifying to a title to his immediate employer only, and not to the latter's assigns or any third person, between whom and the attorney there is no privity." *Shearman and Redfield on Negligence*, Revised Edition, 3d Vol., page 1485.
>
> *We are of opinion that the facts set out in this declaration are not sufficient in law to establish the relationship of client and attorney between the plaintiffs and defendant in this case.*

*Kendall v. Rogers, supra,* 181 Md. at 613, 31 A.2d at 315 (emphasis supplied). Our predecessors reiterated these principles in *Reamer v. Kessler*, 233 Md. 311, 196 A.2d 896 (1964), which involved an attorney who had negligently certified that certain mortgagors had good title to machinery purportedly covered by their respective mortgages. Although the attorney in *Reamer* did not appeal from the finding of negligence or from liability, except as to certain amounts, the Court reaffirmed that liability for malpractice is primarily contractual in nature.

■ These cases demonstrate that Maryland followed the strict privity rule without deviation until 1972. Beginning with our 1972 decision in *Prescott v. Coppage, supra,* however, Maryland appellate courts began to explore and determine the contours of the third party beneficiary theory of recovery in the context of attorney liability to nonclients. *See Kirgan v. Parks,* 60 Md.App. 1, 478 A.2d 713, *cert. denied,* 301 Md. 639, 484 A.2d 274 (1984); *Clagett v. Dacy,* 47 Md.App. 23, 420 A.2d 1285 (1980). An examination of these cases readily reveals that this theory does not supplant entirely the strict privity rule, but instead operates as a limited exception to that rule.

*Prescott* involved the receiver of a savings and loan association (Medley) who owed certain monies to the receiver of a deposit insurance company (Coppage). Coppage sued the court appointed special counsel for Medley (Prescott), alleging that his erroneous advice had led Medley to pay sums from his receivership estate to the association's depositors rather than to Coppage, whose claim had priority. In writing for a unanimous court, Judge Menchine (specially assigned) reasoned that all creditors of the savings and loan association were third party beneficiaries of the receivership. Because Prescott was under a duty to aid the receiver in the performance of his duties, the creditors, including Coppage, were third party beneficiaries of Prescott's performance of his court appointed duties. As a result, Coppage, as third party beneficiary, could sue to recover losses caused by Prescott's improper performance of those duties.

Six years later, the Court of Special Appeals analyzed *Prescott*'s third party beneficiary theory in *Clagett v. Dacy, supra.* In that case, the third parties were the high bidders at a foreclosure sale, but because the attorneys failed to conduct the sale properly, the sale was set aside—twice. Eventually, the debtor redeemed the property by discharging his loan, leading the bidders to sue the attorneys. The bidders alleged that the attorneys owed them a duty to use care and diligence and to conduct the sale properly and

carefully. The trial court, however, concluded that the attorneys did not owe a duty to the bidders. In affirming the trial court's judgment, the *Clagett* court, speaking through Judge Wilner, observed that *Prescott* "seem[s] to suggest a modest relaxation of the strict privity requirement to the extent of allowing a true third party beneficiary to sue an attorney as he could sue any other defaulting or tortious party to a contract made for his benefit." *Id.* at 27, 420 A.2d at 1288. The *Clagett* court interpreted *Prescott* as making clear that the traditional rules governing whether one is a third party beneficiary are controlling: that the person must be "part of a class of persons specifically intended to be the beneficiary of the attorney's undertaking." *Id.* at 29, 420 A.2d at 1289.

In the most recent Maryland appellate decision to raise the third party beneficiary theory in the attorney malpractice context, the Court of Special Appeals remarked that it is "a definite maybe" whether a testamentary beneficiary has standing to sue the attorney who drafted the testator's will. *See Kirgan v. Parks, supra.* On the facts presented in that case, however, the court rejected the beneficiary's cause of action because the asserted testamentary intention was not apparent on the face of the will.

### B.

Based on our review of the above cases, we think it clear that Maryland, as a general rule, adheres to the strict privity rule in attorney malpractice cases. The sole exception that we have recognized to this rule is the third party beneficiary theory. Although this exception is "peculiarly applicable" to contract actions, *Clagett v. Dacy, supra,* 47 Md.App. at 28, 420 A.2d at 1289, its scope has a broader range. In our view, the scope of duty concept in negligence actions may be analogized to the third party beneficiary concept in the context of attorney malpractice cases. Thus, to establish a duty owed by the attorney to the nonclient the latter must allege and prove that the intent of the client to benefit the nonclient was a direct purpose of the transaction

or relationship. In this regard, the test for third party recovery is whether the intent to benefit actually existed, not whether there could have been an intent to benefit the third party. If the third party alleges and proves the remaining elements of a negligence cause of action, he can recover against the attorney in negligence. This Court essentially adopted this test in *Prescott v. Coppage, supra,* and it generally comports with the position taken by several other courts of last resort. *See Pelham v. Griesheimer, supra; Guy v. Liederbach, supra; see also* Note, *Attorneys' Liability to Third Parties for Malpractice: The Growing Acceptance of Liability in the Absence of Privity,* 21 Washburn L.J. 48, 59 (1981) ("The intent of the *client* to benefit the third party must be the primary or direct purpose of the transaction") (emphasis supplied; footnote omitted).[6]

The foregoing suggests that the third party beneficiary exception has a rather narrow scope. Properly applied, this exception will not expose the attorney to endless litigation brought by those who might conceivably derive some indirect benefit from the contractual performance of the attorney and his client. Moreover, this exception should have limited application in adversarial proceedings because our Code of Professional Responsibility requires that a lawyer represent his client zealously within the bounds of the law (Canon 7) and that the lawyer ordinarily not represent or act for conflicting interests in a transaction (Canon 5; EC 5-1, 5-14, 5-15, 5-19, 5-22; DR 5-105). *See also Clagett v. Dacy, supra,* 47 Md.App. at 30, 420 A.2d at 1290 (discussing professional responsibility of attorneys in context of attor-

---

6. Interestingly, commentators have suggested that the predominant inquiry under the Lucas balancing approach "has generally resolved to one criterion: were the services intended to benefit the plaintiff." R. Mallen & V. Levit, *supra,* § 80, at 157 (footnote omitted). According to these commentators, "[r]egardless of whether the legal theory is based upon express or implied contract, the determinative question is did the attorney and his client intend the plaintiff to be *the* beneficiary of his services. An incidental benefit does not suffice to impose a duty upon the attorney." *Id.* (footnotes omitted).

ney liability to third persons); 11:25 Md. Reg. 3–54 (containing Report of the Select Committee of the Court of Appeals of Maryland to Study the ABA Model Rules of Professional Conduct).

With these considerations in mind, we now turn to the facts of this case.

### III

In August 1977 Robert and Sally Flaherty (the Flahertys) entered into a contract of sale for the purchase of a home in Frederick County for $63,000. To finance their purchase the Flahertys secured a $55,000 mortgage loan from the First Federal Savings and Loan Association of Hagerstown, Maryland (First Federal). After First Federal had approved the loan and after the purchase price of the property as well as the mortgage amount had been established, First Federal retained the law firm of Weinberg, Michel and Sterns (Weinberg) to represent it at settlement of the purchase of the property. The Flahertys did not retain separate counsel, a fact of which Weinberg was aware.

At settlement, Weinberg assured the Flahertys that they were purchasing the property as described in the contract of sale, and that a dwelling and well were located on the property within the described boundary lines. As part of the settlement costs the Flahertys paid $60 for a survey, and in return received a survey prepared by Wilbur Ford, Jr., on December 17, 1976 (Ford survey). This survey indicated that the northernmost corner of the dwelling was twenty-six feet from the nearest boundary lines.

After settlement the Flahertys moved into the home and constructed an above-ground swimming pool to the northeast corner of the dwelling as reflected in the Ford survey and continued to use the well. In 1982, when contemplating further improvements to the property, the Flahertys obtained another survey of their property. This 1982 survey indicated that the well was not on their property, and that the swimming pool, driveway, and a retaining wall that

adjoined the Flahertys' home all encroached upon their neighbor's property. In July 1982 the Flahertys requested Weinberg to provide them with the surveys Weinberg had in its possession concerning the Flaherty property. Weinberg responded by providing the Flahertys with a survey completed by Fox and Associates, Inc. (Fox survey) in December 1977. The Fox survey, which was ordered by First Federal, was completed approximately four weeks after the settlement date. This particular survey revealed these encroachments and that the northernmost corner of the home was eighteen, not twenty-six, feet from the nearest boundary line.

The Flahertys filed a four count declaration against Weinberg and Ford in the Circuit Court for Frederick County in October 1982. The declaration contained two counts against Weinberg based upon theories of negligence and breach of warranty, with the remaining two counts against Ford predicated upon the same theories of recovery. Weinberg filed a demurrer to this declaration, which the trial court sustained with leave to amend. The Flahertys filed an amended declaration on January 3, 1983, and a second amended declaration on January 25, 1983. In addition to the counts stated above, the second amended declaration included a count for negligent misrepresentation and an assertion that First Federal's hiring of Weinberg was intended to benefit the Flahertys. Weinberg filed a demurrer to the second amended declaration, which the trial court sustained without leave to amend. The trial court found that Weinberg owed no duty to the Flahertys under the facts as alleged, reasoning that no privity of contract existed between the Flahertys and Weinberg and that the Flahertys were not specifically intended beneficiaries of the contract between Weinberg and First Federal.

Shortly thereafter the Flahertys filed a motion for final judgment under former Md.Rule 605 a (now Md.Rule 2–602) in an attempt to obtain an appealable final judgment as to Weinberg. Because the trial court denied this motion, the Flahertys voluntarily dismissed their suit against Ford so

that they could prosecute an immediate appeal against Weinberg. The Flahertys thereupon appealed to the Court of Special Appeals, but we granted certiorari prior to decision by that Court. We reverse.

## A.

In bringing a professional malpractice case against Weinberg, the Flahertys assert three causes of action: (1) negligence; (2) breach of warranties; and (3) negligent misrepresentation. Although we have classified an action for attorney malpractice as being in contract, the gravamen is the negligent breach of the contractual duty. *See Mumford v. Staton, Whaley & Price,* 254 Md. 697, 708, 255 A.2d 359, 363-64 (1969); *Reamer v. Kessler, supra,* 233 Md. at 611-12, 196 A.2d at 899; *Wlodarek v. Thrift, supra,* 178 Md. at 468, 13 A.2d at 781. Thus, regardless of whether a plaintiff brings an attorney malpractice action in contract or tort, he must allege and prove the existence of a duty between the plaintiff and the defendant in the first instance. Once the plaintiff satisfies this threshold requirement, he must then allege and prove the remaining elements of each theory of recovery to establish liability.

In their second amended declaration the Flahertys assert a cause of action based on negligence, a theory of recovery that traditionally arises in the professional malpractice context. As discussed in Section II.A., *supra,* a prerequisite for maintaining a negligence action against an attorney is that the plaintiff establish an employment relationship between himself and the attorney. *See Kendall v. Rogers, supra.* Although an express employment agreement is not necessary in all cases, *see Central Cab Co. v. Clarke,* 259 Md. 542, 549, 270 A.2d 662, 666 (1970) (failure to agree on payment of retainer does not preclude an attorney-client relationship), the circumstances must clearly indicate an employment relationship. Here, the Flahertys did not employ Weinberg and, as a result, the trial court properly sustained the demurrer as to the first count.

■ The Flahertys also assert a cause of action for breach of express or implied warranties. These warranties, however, arise only as provided by law or as they are established under a contractual relationship. Because the Flahertys have not pointed to any statute that extends a warranty under these circumstances, and because they have not alleged a contractual relationship between Weinberg and themselves, their breach of warranties claim is demurrable.

■ Lastly, the Flahertys assert a cause of action for negligent misrepresentation, the principal elements of which are the following:

(1) The defendant, *owing a duty of care to the plaintiff,* negligently asserts a false statement;

(2) The defendant intends that his statement will be acted upon by the plaintiff;

(3) The defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;

(4) The plaintiff, justifiably, takes action in reliance on the statement; and

(5) The plaintiff suffers damage proximately caused by the defendant's negligence.

*Martens Chevrolet v. Seney,* 292 Md. 328, 337, 439 A.2d 534, 539 (1982) (emphasis supplied). Similar to the causes of action based on negligence and breach of warranties, it is clear that the attorney must owe a duty to the plaintiff for the plaintiff to recover under this theory. *See* R. Mallen & V. Levit, *supra,* § 100, at 169.

## B.

■ As indicated, this case reaches us on demurrer.[7] In considering the sufficiency of a declaration on demurrer,

---

**7.** By order dated April 6, 1984, we approved and adopted effective July 1, 1984, a revision of the Maryland Rules. This revision resulted in the abolishment of demurrers. *See* Md.Rule 2-302. Maryland Rule 2-322(b)(2), which replaced former Md.Rules 345 and 371 b,

we are required to accept as true all well-pleaded material facts in the declaration and exhibits thereto as well as any reasonable inferences that may be drawn therefrom. *Tadjer v. Montgomery County*, 300 Md. 539, 542, 479 A.2d 1321, 1322 (1984); *Cox v. Prince George's County*, 296 Md. 162, 169, 460 A.2d 1038, 1042 (1983); *Citizens Planning & Housing Association v. County Executive*, 273 Md. 333, 337–38, 329 A.2d 681, 683–84 (1974); *Hall v. Barlow Corp.*, 255 Md. 28, 42, 255 A.2d 873, 880 (1969); *Parish v. Maryland & Virginia Milk Producers Association*, 250 Md. 24, 34, 242 A.2d 512, 538 (1968). To withstand demurrer a party need only allege facts that, if proven, would entitle him to relief. As the late Judge Lowe succinctly stated in a 1982 decision by the Court of Special Appeals:

> [Demurrers] are solely to provide a minimization test for a cause of action either where a question of law may be decisive of litigation or the facts alleged do not constitute a cause of action. The "precise rubric" itself provides that a mere informal statement of a cause of action will suffice and that it shall be "brief and concise and contain only such statements of facts as may be necessary to constitute a cause of action...." Md.Rule 301 b.

*General Federal Construction, Inc. v. D.R. Thomas, Inc.*, 52 Md.App. 700, 705, 451 A.2d 1250, 1253–54 (1982).

In view of these pleading principles, the Flahertys argue that their second amended declaration states a cause of action under the third party beneficiary theory which, as we have seen, is a limited exception to the strict privity rule. Based on this argument, the Flahertys contend that the trial court erred in sustaining Weinberg's demurrer without leave to amend. We agree.

■ Initially, we note that the Flahertys direct our attention to several factors they contend are determinative of whether they are third party beneficiaries with legally

---

provides that a defense based upon the failure to state a claim upon which relief can be granted may be made by motion to dismiss filed before the answer, if an answer is required.

enforceable rights. A number of these factors, however, are inconclusive. For example, the Flahertys elected to go to settlement without retaining separate counsel. This factor, standing alone, does not establish whether First Federal intended to benefit the Flahertys, nor does it establish whether that intent was the primary purpose of the transaction or relationship. Although the Flahertys may have believed that their interests would be adequately protected by Weinberg's representation of First Federal, the unilateral action of the Flahertys cannot establish the intent of First Federal. Moreover, there are no allegations that First Federal or Weinberg induced the Flahertys to attend settlement without benefit of separately retained counsel. At most, the Flahertys' decision not to retain separate counsel merely buttresses their assertion that all parties understood that First Federal intended to confer a direct benefit upon the Flahertys.

Other factors are similarly inconclusive of the requisite intent to benefit.[8] The Flahertys allege that First Federal desired to make a loan, that they desired to accept the loan, that First Federal wanted security for its loan (i.e., property with clear title and no encroachments), and that the Flahertys wanted to own property with good title and free of encroachments. In addition, the Flahertys allege that "[a]t the time of the settlement the lending institution's interests were not diverse to that of the plaintiff[s']." Although the third party beneficiary exception is ordinarily inapplicable in the adversarial context, this does not suggest that a nonclient is automatically transformed into a

---

**8.** Although not alleged in the second amended declaration, we recognize that the Flahertys ultimately paid Weinberg's fee. This factor is inconclusive of the requisite intent to benefit because the Flahertys paid the fee to First Federal as a condition of the loan. First Federal, aware of the expenses involved in the processing of loan applications, simply required the prospective borrower (here the Flahertys) to pay these expenses. This factor does not, however, make the mortgagee's attorney the mortgagor's attorney, just as paying the required document processing fees would not transform a First Federal loan clerk into an employee of the Flahertys.

third party beneficiary with legally enforceable rights upon the resolution of the differences between himself and the mortgagee. Furthermore, the interests of the mortgagor and mortgagee differ throughout the mortgage process. One important area of difference is the respective title requirements of the parties. The mortgagee merely wants assurances that title is not impaired to the point where its value will be reduced below the amount of the outstanding indebtedness. By contrast, the mortgagor wants assurances of maximum enjoyment of the property and freedom from post-settlement claims by third parties. *See Page v. Frazier*, 388 Mass. 55, 445 N.E.2d 148, 153 (1983) (explaining that some title defects may not concern the bank insofar as its security is concerned, but may concern the buyer).

 In view of these differing interests, it is manifest that conflicts of interests may arise if the attorney represents both the mortgagor and mortgagee. Judge Wilner, writing for the *Clagett* Court, cogently observed that "[a]ttorneys are not quite the free agents as some others are in the world of commerce. There are well-recognized limitations, judicially imposed and enforced, upon how they may conduct themselves, and who they may, and may not, represent in certain situations." *Clagett v. Dacy, supra*, 47 Md.App. at 29, 420 A.2d at 1289; *see also* Durfee, *Third-Party Malpractice Claims Against Real Estate Lawyers*, 13 Colo.Law. 996, 996 (1984) (indicating that "[r]eal estate practice is particularly conducive to conflicts of interest[.]"); *The Proper Role of the Lawyer in Residential Real Estate Transactions* 11 (A Report of the Special Committee on Residential Real Estate Transactions of the American Bar Association) (Final Draft 1974) (discussing conflicts of interest between lender and buyer). Despite this potential for conflicts of interest, it remains that the Flahertys have pleaded facts that give rise to an inference that no conflict of interest existed between themselves and First Federal.

 The Flahertys, however, go on to allege that "[t]he hiring of [Weinberg] was intended to benefit the lender as well as the purchasers in that both had identical

interests in the property. The plaintiffs were intended, either expressly or impliedly, to benefit from the defendant attorneys' undertaking in this matter." As we see it, by this allegation the Flahertys assert as fact that they were intended to benefit directly from Weinberg's services as an attorney. Therefore, Weinberg was under a duty to ascertain the correct boundaries of the property and so advise the Flahertys, in which case the Flahertys would have suffered no loss. Although the Flahertys may find it difficult to support their claim that a direct purpose of the relationship between First Federal and Weinberg was to benefit the Flahertys, they have nevertheless alleged this circumstance as a fact and such allegation is enough to survive the demurrer.[9]

We therefore hold that the trial court erred in sustaining Weinberg's demurrer without leave to amend to the third count.

JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY REVERSED AND CASE REMANDED TO

---

**9.** We note that Weinberg points to other documents that suggest that First Federal did not intend to confer a direct benefit upon the Flahertys. For instance, in a letter dated September 22, 1977, from First Federal to the Flahertys, the Flahertys were informed that:

[First Federal] will refer this loan to one of our settlement attorneys, Weinberg, Michel and Stern, Frederick, Maryland, who will contact you *for representation of us* in the processing and closing of the loan for which you will pay an initial loan charge at the time of settlement. All questions concerning the loan and settlement arrangements should be referred to the attorney's office [emphasis supplied.]

In addition, the Flahertys received a document entitled "Statement of Charges" in which they were advised that Weinberg's services "were performed on behalf of [First Federal] and *not on behalf of the Borrowers*[.]" [Emphasis supplied.]. Regardless of the persuasiveness of these documents, we are limited in considering only those well-pleaded material facts in the second amended declaration and exhibits thereto as well as any reasonable inferences that may be drawn therefrom. These documents were produced in response to a Request for Production of Documents and, consequently, were not properly before the lower court in considering the demurrer. Therefore, under the procedural posture of this case, we disregard these documents.

**140**

THAT COURT FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.

APPELLEES TO PAY THE COSTS.